## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **DOMINION FINANCIAL SERVICES, LLC,** | * | |
| Plaintiff, | * | |
| v. | * | **CIVIL NO. JKB-22-0705** |
| **ALEXANDER PAVLOVSKY, *et al.*,** | * | |
| Defendants. | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

### MEMORANDUM

Plaintiff Dominion Financial Services, LLC ("Dominion"), a lending company, brought this action for breach of contract, breach of guarantor, and fraud against Defendants Alexander Pavlovsky, Konstantin Pavlovsky, Willman Jose Cabrera, and more than a dozen companies with which the Pavlovskys and Cabrera are affiliated.[1]  (Compl., ECF No. 1.)  The Clerk of Court has entered orders of default against all Defendants, (*see* ECF Nos. 28, 40, 58), and presently pending is Dominion's Motion for Default Judgment pursuant to Federal Rule of Civil Procedure 55.  (ECF No. 62.)  The Motion is fully briefed and no hearing is required.  *See* Fed. R. Civ. P. 55(b)(2); Loc. R. 105.6 (D. Md. 2021).  The Court will grant in part and deny in part Dominion's Motion and will enter default judgment for Dominion as set forth below.

---

[1] Those companies are Kendall Miami Land LLC, Miami5th Developers LLC, NW 4th Land LLC, 540 NW 69th St LLC, 57th Land LLC, GST Development Inc., Miami42 LLC, 5421 NW5 LLC, 6811 Project LLC, HT Project LLC, 78 NE 57th LLC, 5437 NW5 LLC, Rubakha Realty Inc., Rubakha Realty LLC, and MPAV Realty LLC.  (*See* Compl.) Dominion also sued Independent Title of Fort Lauderdale, Inc. ("Independent Title"), a title company that facilitated Defendants' real estate transactions.  (*See id.*)  Dominion has since voluntarily dismissed Independent Title from this action.  (*See* ECF No. 52.)

## I.     *Factual Background*[2]

Dominion, a Maryland company, issues commercial and residential real estate loans throughout the United States. (Compl. ¶ 1.) This action concerns a scheme to defraud related to eight commercial loans (the "Loans") that Dominion issued to companies owned by Alexander Pavlovsky between March and November of 2021. (*See generally id.*) The Loans were for the purchase and renovation of seven properties in Florida and one property in New York (the "Properties"): namely, SW 42nd Avenue in Miami, Florida ("Loan One"); 5421 NW 5th Avenue in Miami ("Loan Two"); 6775 NW 4th Avenue in Miami ("Loan Three"); 540 NW 69th Street in Miami ("Loan Four"); 78 NE 57th Street in Miami ("Loan Five"); 5437 NW 5th Avenue in Miami ("Loan Six"); 6811 NW 4th Avenue in Miami ("Loan Seven"); and 193 Cannon Avenue in Staten Island, New York ("Loan Eight"). (*See id.*)

Alexander Pavlovsky obtained the Loans through his companies[3]—which Dominion alleges were "false" shell companies created specifically to further this fraudulent scheme—after having "inflated [the] purchase prices" of the Properties with the help of his associate, Willman Jose Cabrera. (*Id.* ¶ 24, 311.) Operating through his own companies[4] that Dominion alleges were also "created . . . to execute [the] scheme," Cabrera bought each of the Properties and then quickly sold them at inflated prices to Alexander Pavlovsky's companies. (*Id.* ¶ 311.) For instance,

---

[2] Defendants, "by . . . default, admit[ ] the plaintiff's well-pleaded allegations of fact[.]" *Ryan v. Homecomings Fin. Network,* 253 F.3d 778, 780 (4th Cir. 2001) (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank,* 515 F.2d 1200, 1206 (5th Cir. 1975)). Accordingly, at this stage of litigation, the Court accepts as true the well-pleaded factual allegations in Dominion's Complaint. "In the Fourth Circuit, district courts analyzing default judgments have applied the standards articulated by the United States Supreme Court in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), to determine whether allegations within the complaint are 'well-pleaded.'" *Vasquez-Padilla v. Medco Props., LLC,* Civ. No. PX-16-3740, 2017 WL 4747063, at *2 (D. Md. Oct. 20, 2017).

[3] The companies through which Alexander Pavlovsky purchased the Properties and obtained the Loans are Defendants Miami42 LLC, 5421 NW5 LLC, 6811 Project LLC, HT Project LLC, 78 NE 57th LLC, 5437 NW5 LLC, and Rubakha Realty Inc. (*See* Compl. ¶¶ 24–102.)

[4] Cabrera's companies are Defendants Kendall Miami Land LLC, Miami5th Developers LLC, NW 4th Land LLC, 540 NW 69th St LLC, 57th Land LLC, and GST Development Inc. (*See* Compl. ¶¶ 24–102.)

Cabrera's company 57th Land LLC purchased one of the Properties—78 NE 57th Street—for $220,000 from an unrelated third party, and then sold it to Alexander Pavlovsky's company 78 NE 57th LLC for $1.3 million on the same day. (*Id.* ¶ 66.) In exchange for his cooperation in this price-hiking scheme, Cabrera was paid a total of $92,000 in "kickbacks" from a Chase bank account registered to Defendant Rubakha Realty LLC, a New Jersey corporation whose registered agent is Alexander Pavlovsky's father, Defendant Konstantin Pavlovsky. (*Id.* ¶¶ 103–114.) A statement for that bank account lists Alexander Pavlovsky's Miami Beach home address as Rubakha Realty LLC's mailing address. (Ex. EE to Compl., ECF No. 1-29.)

Alexander Pavlovsky sought the Loans from Dominion to cover the Properties' inflated purchase prices, as well as the cost of renovations that he represented would be performed at the Properties. (Compl. ¶¶ 24, 26.) He signed the mortgage agreements as either the "Sole Member" or "President" of whichever of his companies had purchased each Property. (*See, e.g.*, Contract Documents for Loan One, Ex. B to Compl., ECF No. 1-22, at 15 (Alexander Pavlovsky signed mortgage agreement as "Sole Member" of Borrower Miami42, LLC).) Each mortgage agreement provided in part that the borrower would "be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower . . . gave materially false, misleading, or inaccurate information or statements to [Dominion] . . . in connection with the Loan." (*Id.* at 7 ¶ 8.)

In addition to the mortgage agreement, each Loan's contract documents included a Commercial Promissory Note (the "Note") with a Construction Addendum (the "Addendum"). (*See, e.g., id.*) Each Note bound the borrower to a payment schedule, enumerated certain "Events of Default," and contained an acceleration clause which provided that, "[u]pon the occurrence of any Event of Default[,]" Dominion would have "sole discretion" to "[d]eclare the entire

outstanding principal amount, together with all accrued interest and all other sums due under this Note, to be immediately due and payable . . . without diligence, presentment, demand or notice, which are hereby expressly waived[.]" (*Id.* at 21 ¶ 10, 22 ¶ 11.) The "Events of Default" included "[t]he failure of Borrower or any other Obligor to . . . pay any sum due under the Loan Documents when due" and "[t]he determination in good faith by [Dominion] that any representation or warranty of any Obligor was not, when made, true and accurate in all material respects[.]" (*Id.* at 21 ¶ 10.1, 22 ¶ 10.14.) By signing the Note, the borrower agreed to "submit[ ] to the personal, nonexclusive jurisdiction and venue of state courts sitting in, and federal courts having jurisdiction over, Baltimore City, Maryland[.]" (*Id.* at 24 ¶ 22.) Each Note also contained an indemnification clause that bound the borrower to "pay all costs and Professional Fees incurred in connection with" Dominion's enforcement of the loan contract. (*Id.* at 22 ¶ 12.)

The Addendum to each Note identified a portion of each Loan that Dominion would disburse only "to fund construction and related expenses[.]" (*Id.* at 28 ¶ 2.1.) The Addendum bound the borrower to spend the funds only on construction, to complete construction on time, and to do all work "in compliance with . . . all applicable building codes"; a failure to comply with any of those requirements constituted an "Event of Default." (*Id.* at 30 ¶¶ 3.1, 3.2, 31 ¶¶ 4.1, 4.7.)

Finally, each Loan's contract documents included a Guaranty and Indemnification Agreement (the "Guaranty Agreement") that bound certain third-party signatories, jointly and severally, to "unconditionally guarant[y] and become[] surety for" the entire amount due under the Note, "whether at stated maturity, by acceleration or call for redemption or otherwise[.]" (*Id.* at 43 ¶ 6.13, 36 ¶ 3.1(a).) Dominion reserved the right to "proceed first and directly against the Guarantor . . . without proceeding against or exhausting" its remedies against the borrower. (*Id.* at 38 ¶ 4.3.) The guarantors also agreed to submit to the personal jurisdiction of courts with

4

jurisdiction over Baltimore City, Maryland, and to be liable to Dominion for any "cost or expense (including without limitation Professional Fees)" associated with "any litigation to enforce or defend [Dominion's] rights under the Loan Documents or otherwise relating to the relationship of the parties[.]" (*Id.* at 41 ¶ 6.5, 36 ¶ 3.2.) Alexander Pavlovsky personally guaranteed each of the Loans; Konstantin Pavlovsky personally guaranteed Loans One, Two, Three, Four, and Eight; Rubakha Realty LLC (with Alexander Pavlovsky signing as its "Sole Member") guaranteed Loans Five, Six, and Seven; and Defendant MPAV Realty LLC (with Alexander Pavlovsky signing as its "Sole Member") guaranteed Loans Five and Seven. (*See generally* Compl.; Contract Documents for Loans Five, Six, Seven, Exs. Q, U, X to Compl., ECF Nos. 1-52, 1-58, 1-61.)

The following chart summarizes which Defendants are parties to each of the Loan contracts at issue:[5]

| (1) SW 42nd Ave | (2) 5421 NW 5th Ave | (3) 6775 NW 4th Ave | (4) NW 69th St. |
|---|---|---|---|
| **Borrower:**<br>Miami42 LLC | **Borrower:**<br>5421 NW5 LLC | **Borrower:**<br>6811 Project LLC | **Borrower:**<br>HT Project LLC |
| **Guarantors:**<br>Alexander Pavlovsky,<br>Konstantin Pavlovsky | **Guarantors:**<br>Alexander Pavlovsky,<br>Konstantin Pavlovsky | **Guarantors:**<br>Alexander Pavlovsky,<br>Konstantin Pavlovsky | **Guarantors:**<br>Alexander Pavlovsky,<br>Konstantin Pavlovsky |
| **Loan Amount:**<br>$1.79m | **Loan Amount:**<br>$2.09m | **Loan Amount:**<br>$1.747m | **Loan Amount:**<br>$1.68m |
| **(5) NE 57th St.** | **(6) 5437 NW 5th Ave** | **(7) 6811 NW 4th Ave** | **(8) Cannon Ave (NY)** |
| **Borrower:**<br>78 NE 57th LLC | **Borrower:**<br>5437 NW5 LLC | **Borrower:**<br>6811 Project LLC | **Borrower:**<br>Rubakha Realty Inc. |
| **Guarantors:**<br>Alexander Pavlovsky,<br>Rubakha Realty LLC,<br>MPAV Realty LLC | **Guarantors:**<br>Alexander Pavlovsky,<br>Rubakha Realty LLC | **Guarantors:**<br>Alexander Pavlovsky,<br>Rubakha Realty LLC,<br>MPAV Realty LLC | **Guarantors:**<br>Alexander Pavlovsky,<br>Konstantin Pavlovsky |
| **Loan Amount:**<br>$ 1.875m | **Loan Amount:**<br>$2.09m | **Loan Amount:**<br>$1.815m | **Loan Amount:**<br>$2.205m |

---

[5] This information is drawn directly from the Loan contracts. (*See* Exs. B, E, H, M, Q, U, X, BB to Compl., ECF Nos. 1-22, 1-28, 1-34, 1-44, 1-52, 1-58, 1-61, 1-23.)

In addition to having misrepresented the Properties' true values in order to obtain inflated Loans, Alexander Pavlovsky's companies violated each of their Loan contracts with Dominion in ways that constituted "Events of Default." These included:[6]

- **Loan One** (SW 42nd Avenue):  Construction at the property was "abandoned" before completion (Compl. ¶ 33);

- **Loan Two** (5421 NW 5th Avenue):  Alexander Pavlovsky withdrew a total of $876,000 in construction funds from Dominion, but "the actual construction work completed totaled less than $100,000." (*Id.* ¶¶ 43–44.)  In order to induce Dominion to disburse the construction funds, Alexander Pavlovsky provided Dominion with "false building permits" for the property; "a search on permits issued by the City of Miami . . . shows that the permits provided by [Alexander] Pavlovsky do not exist[.]" (*Id.* ¶ 116.) The City of Miami subsequently issued an unsafe structure notice as to the completed construction (*id.* ¶ 45);

- **Loan Three** (6775 NW 4th Avenue):  Alexander Pavlovsky withdrew a total of $718,000 in construction funds from Dominion, but "the cost of actual construction work completed . . . was a mere fraction of the amount drawn." (*Id.* ¶¶ 53–54.) In order to induce Dominion to disburse the construction funds, Alexander Pavlovsky provided Dominion with "a false building permit" for the property; "a search on permits issued by the City of Miami . . . shows that the permit provided by [Alexander] Pavlovsky does not exist[.]" (*Id.* ¶ 117.) The City of Miami subsequently held an unsafe structure hearing as to the completed construction and issued a demolition notice on February 10, 2022 (*id.* ¶ 55);

---

[6] Dominion also asserts that the parties to each Loan contract owe "late fees," implying—but not expressly alleging—failures to make timely repayments that would also have constituted "Events of Default." (Compl. ¶¶ 36, 46, 56, 65, 75, 85, 94, 102.)

- **Loan Four** (NW 69th Street): Alexander Pavlovsky withdrew a total of $393,000 in construction funds from Dominion, but "no work other than some foundation pouring was completed" at the property. (*Id.* ¶ 63.) The City of Miami subsequently held an unsafe structure hearing as to the completed construction and demolished the property on February 22, 2022 because the "new construction [was] performed without a permit" (*id.* ¶ 64);

- **Loan Five** (NE 57th Street): Alexander Pavlovsky withdrew a total of $790,000 in construction funds from Dominion, but the "construction work actually completed [at the] [p]roperty was worth less than $100,000[.]" (*Id.* ¶¶ 72–73.) In order to induce Dominion to disburse the construction funds, Alexander Pavlovsky provided Dominion with "a false building permit" for the property; "a search on permits issued by the City of Miami . . . shows that the permit provided by [Alexander] Pavlovsky does not exist[.]" (*Id.* ¶ 118.) The City of Miami subsequently held an unsafe structure hearing as to the completed construction and demolished the property on February 18, 2022 because the "new construction [was] performed without a permit" (*id.* ¶ 74);

- **Loan Six** (5437 NW 5th Avenue): Alexander Pavlovsky withdrew a total of $866,000 in construction funds from Dominion, but "[t]his entire amount was overdrawn, as absolutely no construction work was actually completed and only some site work was performed." (*Id.* ¶ 83.) In order to induce Dominion to disburse the construction funds, Alexander Pavlovsky provided Dominion with "a false building permit" for the property; "a search on permits issued by the City of Miami . . . shows that the permit provided by [Alexander] Pavlovsky does not exist[.]" (*Id.* ¶ 119.) The City of Miami subsequently held an unsafe structure hearing as to the completed construction and issued a demolition notice on February 10, 2022 (*id.* ¶ 84);

7

- **Loan Seven** (6811 NW 4th Avenue):  Alexander Pavlovsky withdrew a total of $718,000 in construction funds from Dominion, but "the cost of construction work completed [at the] [p]roperty totaled less than $100,000[.]"  (*Id.* ¶ 92.)  In order to induce Dominion to disburse the construction funds, Alexander Pavlovsky provided Dominion with "a false building permit" for the property; "a search on permits issued by the City of Miami . . . shows that the permit provided by [Alexander] Pavlovsky does not exist[.]"  (*Id.* ¶ 120.) The City of Miami subsequently held an unsafe structure hearing as to the completed construction and issued a demolition notice "due to the severity of its unsafe structure" (*id.* ¶ 93);

- **Loan Eight** (Cannon Avenue):  Alexander Pavlovsky withdrew a total of $650,000 in construction funds from Dominion, but "the actual cost of the work completed was less than $100,000[.]"  (*Id.* ¶ 100.)  The New York State Department of Environmental Conservation subsequently issued a notice of illegal construction because the property "is located 'within a freshwater wetland adjacent area' regulated by the Department."  (*Id.* ¶ 101 (quoting Illegal Construction Letter, Ex. CC to Compl., ECF No. 1-25).)

## II.   *Procedural History*

Dominion commenced this action on March 22, 2022.  (*See* Compl.)  It made claims of breach of contract and breach of guarantor against the parties to each of the eight Loans.  (*See id.* ¶¶ 123–306.)  Additionally, Dominion alleged fraud against all Defendants, claiming broadly that they had, acting "with actual malice," "fraudulently represented to Dominion that the loans applied for were legitimate applications for loans, when they were in fact part of a fraudulent scheme to collect money from Dominion based upon inflated purchase prices[.]"  (*Id.* ¶¶ 320, 308.) Dominion initially sought actual and compensatory damages, punitive damages for fraud,

attorneys' fees, costs, interest, and an injunction preventing Defendants from "diminishing the loaned funds by way of an asset freeze[.]" (*Id.* ¶¶ 306(A), 320(A), 327.)

Dominion expended significant effort and resources attempting to serve process on Defendants, and on Alexander Pavlovsky in particular, as detailed in this Court's prior Memorandum. (ECF No. 55.) Ultimately, all Defendants were served, none answered Dominion's Complaint, and the Clerk of Court entered orders of default against each. (ECF Nos. 28, 40, 58.) Alexander Pavlovsky—the only Defendant to enter an appearance in this litigation to date—moved to set aside the Clerk's entry of default against him, but this Court declined to do so, finding that "it would be inappropriate to excuse behavior as evasive as Alexander Pavlovsky's by allowing him another opportunity to answer Dominion's claims." (ECF No. 55 at 8.)

Dominion filed the instant Motion for Default Judgment on December 29, 2022. (ECF No. 62.) Dominion no longer seeks punitive damages or injunctive relief, but it argues that it "has pled sufficient facts with particularity to establish that all the Defendants are jointly and severally liable for fraud" and that they should thus all be held liable for the entire sum of Dominion's compensatory damages. (*Id.* ¶¶ 46, 58.) The affidavit of Dominion Partner Jack Bevier indicates that, as of December 28, 2022, Defendants owe Dominion a total of $9,079,051.78 on the Loans; more specifically, Dominion is owed $650,000 for Loan One, $1,426,875.39 for Loan Three, $540,000 for Loan Four, $1,480,000 for Loan Five, $1,720,000 for Loan Six, $1,495,176.39 for Loan Seven, and $1,767,000 for Loan Eight. (Ex. 1 to Mot. Default J., ECF No. 62-1, ¶ 18.) In addition to damages of $9,079,051.78,[7] Dominion seeks prejudgment interest on each outstanding

---

[7] The formal prayer for relief in Dominion's Motion is for only $8,626,597 in damages (*see* Mot. Default J. at 26 ¶ A), but this is the sole reference to that amount, and based on the affidavit of Jack Bevier the Court has calculated that $9,079,051.78 is the accurate measure of Dominion's damages. Accordingly, the Court will assume that the inconsistent prayer for relief was a drafting oversight.

Loan, "post-judgment interest in accordance with 28 U.S.C. § 1961," and $65,332 in attorneys' fees and $22,947.87 in costs related to this litigation. (Mot. Default J. ¶¶ 59, 71, 78.)

In October 2022, while this litigation was pending, Dominion obtained final judgments of foreclosure as to Loans Three and Seven, as well as a final judgment of foreclosure and breach of guaranty as to Loan Two, in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. (Exs. 2–4 to Mot. Default J., ECF Nos. 62-2–62-4.) With the instant Motion, Dominion does not seek a judgment as to Loan Two because the Florida court "already awarded a monetary judgment against the borrower and guarantors for this Property in particular[.]" (Mot. Default J. ¶ 63 n.3.) Dominion does still seek money judgments from this Court as to Loans Three and Seven—in the amount of the "principal remainder of [each loan], plus interest and fees, less the amount received in foreclosure proceedings"—because the Florida court's judgments as to those Loans were "for foreclosure against solely [the Properties]" and "no money judgment has been entered . . . against the Defendants individually" in that jurisdiction. (*Id.* ¶¶ 65 n.4, 69 n.5, 23(b) n.1, 27(b) n.2.)

Alexander Pavlovsky has responded in opposition to Dominion's Motion. (ECF No. 63.) He does not dispute his liability as to Loans One, Four, Five, Six, and Eight, but he contends that Dominion's "attempt to duplicate" judgment as to Loans Three and Seven[8] is improper under the doctrine of merger because those claims "have already been reduced to a judgment in another jurisdiction[.]" (*Id.* ¶ 2.) He also argues that Dominion should be denied attorneys' fees because Dominion's counsel impermissibly "block bill[ed]" for their services. (*Id.* ¶ 5.)

---

[8] Alexander Pavlovsky also objects to the entry of a final judgment as to Loan Two, but because Dominion does not seek one, the Court need not address that objection. (*Resp.* Opp'n Default J. ¶ 2; *see* Mot. Default J. ¶ 63 n.3.)

### III.    Legal Standards

#### A. Default Judgment

After a Court's entry of default against a party under Rule 55(a), the opposing party may move for default judgment. Fed. R. Civ. P. 55(b)(2); *Home Port Rentals, Inc. v. Ruben*, 957 F.2d 126, 133 (4th Cir. 1992). Although the Fourth Circuit has a "strong policy that cases be decided on their merits," *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993), that policy is not without exceptions. Indeed, "[d]efault judgment 'is appropriate when the adversary process has been halted because of an essentially unresponsive party.'" *Grim v. Balt. Police Dep't*, Civ. No. ELH-18-3864, 2019 WL 5865561, at *28 (D. Md. Nov. 8, 2019) (quoting *Entrepreneur Media, Inc. v. JMD Ent. Grp., LLC*, 958 F. Supp. 2d 588, 593 (D. Md. 2013) (internal quotation marks omitted)).

The defendant in default is deemed to admit the plaintiff's well-pleaded factual allegations, but not the plaintiff's conclusions of law or allegations as to the amount of damages. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)); *see also Ancona v. Paragon Int'l Wealth Mgmt., Inc.*, Civ. No. JKB-18-1338, 2019 WL 2289626, at *1 (D. Md. May 28, 2019). "In the Fourth Circuit, district courts analyzing default judgments have applied the standard[ ]" of plausibility pleading "articulated by the United States Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to determine whether allegations within the complaint are 'well-pleaded.'" *Vasquez-Padilla v. Medco Props., LLC*, Civ. No. PX-16-3740, 2017 WL 4747063, at *2 (D. Md. Oct. 20, 2017). Additionally, a plaintiff seeking a default judgment must "allege[ ] fraud with particularity sufficient to satisfy the requirements of Federal Rule of Civil Procedure 9(b)." *Anderson v. Found. For Advancement*,

*Educ. & Emp. of Am. Indians*, 115 F.3d 500, 506 (4th Cir. 1998). Because "[u]nder modern procedure, defaults are not favored by the law[,] any doubts usually will be resolved in favor of the defaulting party." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2681 (4th ed. 2022) (collecting cases). "In short, . . . a default is not treated as an absolute confession by the defendant of [its] liability and of the plaintiff's right to recover." *Ryan*, 253 F.3d at 780.

Thus, even when a court has entered default against a defendant, a plaintiff is not automatically entitled to have a default *judgment* entered. It is the court's task to "determine whether the well-pleaded allegations in [plaintiff's] complaint support the relief sought[.]" *Id.*; *see also Nishimatsu*, 515 F.2d at 1206 ("There must be a sufficient basis in the pleadings for the judgment entered."). A court considering the entry of a default judgment may hold a hearing to ascertain the amount of damages, and generally may forego a hearing "only . . . if the record supports the damages requested." *Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 795 (D. Md. 2010); *see* Fed. R. Civ. P. 55(b)(2)(A)–(D) (explaining that if a sum is not certain or ascertainable through computation, a court may hold a hearing to "conduct an accounting; determine the amount of damages; establish the truth of any allegation by evidence; or investigate any other matter."). The court may rely on "detailed affidavits or documentary evidence to determine the appropriate sum" of damages. *United Comm'y Bank, Inc. v. IAAAA, Inc.*, Civ. No. GJH-20-594, 2021 WL 2685362, at *2 (D. Md. Jun. 29, 2021) (quoting *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001)). "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

## B. *Choice of Law*

Sitting in diversity,[9] a federal court applies the substantive law of the forum state, which, in this case, is Maryland. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In applying the forum state's law, this Court is also bound to apply Maryland's rules for choice of law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 807 (4th Cir. 2013).

Because Maryland follows the rule of *lex loci contractus*, in general "the substantive application of the law to [a] contract between the parties is subject to the enforcement of the jurisdiction where the contract was formed." *Brownlee v. Liberty Mut. Fire Ins. Co.*, 175 A.3d 697, 701 (Md. 2017). However, "it is 'generally accepted that the parties to a contract may agree as to the law which will govern their transaction[.]'" *Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 650 A.2d 246, 248 (Md. 1994) (quoting *Kronovet v. Lipchin*, 415 A.2d 1096, 1104 (Md. 1980)).

Each of the Notes and Guaranty Agreements at issue here contains the following language:

> The Loan Documents shall be deemed to have been made in the State of Maryland. . . . [Signatory] hereby knowingly, intentionally and voluntarily (A) agrees that Maryland law, exclusive of its conflicts of law rules, shall govern the loan documents, the relationship of the parties, and all matters relating thereto[.]

(*See, e.g.*, Contract Documents for Loan One at 24 ¶ 22, 41 ¶ 6.5.) Accordingly, the Court will apply Maryland law to determine the Defendants' contractual liability. Further, the Court will apply Maryland law to Dominion's allegation of fraud because it "relat[es]" to Dominion's contractual relationship with the Defendants. (*See* Compl. ¶ 308 ("Defendants fraudulently represented to Dominion that the loans applied for were legitimate applications for loans, when they were in fact part of a fraudulent scheme to collect money from Dominion[.]").)

---

[9] The Court's basis for jurisdiction over this action is 28 U.S.C. § 1332(a)(i). (*See* Compl. ¶ 21.)

## IV.   *Analysis*

As discussed in detail below, before proceeding to the merits of Dominion's Motion, the Court determines that it has personal jurisdiction over all Defendants and that the doctrine of merger does not bar its entry of money judgments as to Loans Three and Seven.

Turning next to Dominion's allegation of fraud, the Court finds that Dominion has met its burden of pleading to obtain a judgment for fraud in the amount of the full outstanding balance of the Loans—$9,079,051.78, plus post-judgment interest pursuant to 28 U.S.C. § 1961—against Defendant Alexander Pavlovsky and his companies, Miami42 LLC, 5421 NW5 LLC, 6811 Project LLC, HT Project LLC, 78 NE 57th LLC, 5437 NW5 LLC, Rubakha Realty Inc., Rubakha Realty LLC, and MPAV Realty LLC (collectively with Alexander Pavlovsky, the "Alexander Pavlovsky Defendants"), and Defendant Cabrera and his companies, Defendants Kendall Miami Land LLC, Miami5th Developers LLC, NW 4th Land LLC, 540 NW 69th St LLC, 57th Land LLC, and GST Development Inc. (collectively with Cabrera, the "Cabrera Defendants").  However, Dominion has not pled facts with sufficient particularity to obtain a judgment for fraud against Konstantin Pavlovsky.

As to Dominion's claims for breach of contract and breach of guarantor, the Court determines that the Loan contracts entitle Dominion to recoup compensatory damages from the signatories to each Loan, and it will therefore impose judgment against Konstantin Pavlovsky in the amount of $4,383,875.39, the sum of the outstanding balances on the Loans he guaranteed, plus post-judgment interest pursuant to 28 U.S.C. § 1961.  It next finds that Maryland law and the specific facts of this case support a discretionary award of prejudgment interest on the Loans in the amount of six percent per annum dating from December 28, 2022.  Finally, the Court concludes

14

that the Loan contracts bind the Defendant-signatories to reimburse Dominion for its reasonable attorneys' fees and costs totaling $88,279.87 resulting from this litigation.

### A. Personal Jurisdiction

As an initial matter, the Court must have personal jurisdiction over Defendants to enter a binding judgment against them. *See Koehler v. Dodwell*, 152 F.3d 304, 306–07 (4th Cir. 1998). The Court is satisfied that the Alexander Pavlovsky Defendants and Konstantin Pavlovsky consented to this Court's jurisdiction by adopting the Loan contracts' forum selection clause. Although Dominion did not plead facts that establish the Cabrera Defendants' own minimum contacts with Maryland, the Court may exercise personal jurisdiction over them based on their co-conspirators' activities directed toward Maryland.

### 1. Legal Standard

The Fourth Circuit has held that "any judgment entered against a defendant over whom the Court does not have personal jurisdiction is void." *Gonzalez v. Spunk Indus., Inc.*, Civ. No. ELH-18-2935, 2019 WL 4392951, at *2–3 (D. Md. Sept. 13, 2019) (quoting *Koehler*, 152 F.3d at 306–07). Accordingly, this Court has recognized that "it [is] prudent to determine, prior to entry of a default judgment," whether it can exercise personal jurisdiction over a defendant. *Id.* at *3; *see also* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2685 n.18 (4th ed. 2022) ("Before granting a default judgment, the court must first satisfy itself that it has personal jurisdiction over the party against whom a default judgment is requested because a default judgment entered without personal jurisdiction is void.").

To exercise personal jurisdiction over a non-resident defendant, this Court must determine that: (1) jurisdiction is authorized under Maryland's long-arm statute; and (2) the exercise of jurisdiction comports with due process. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.*,

*Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). "The Maryland courts have consistently held that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution. . . . Thus, our statutory inquiry merges with our constitutional inquiry." *Id.* at 396–97 (internal citations omitted). "[D]ue process requires only that . . . a defendant . . . have certain minimum contacts [with the forum state,] . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). "[W]hen . . . the court addresses the question [of personal jurisdiction] on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive [a] jurisdictional challenge." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). Under such circumstances, courts "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs,* 886 F.2d at 676; *see also Mitrano v. Hawes,* 377 F.3d 402, 406 (4th Cir. 2004).

Personal jurisdiction may be either "specific"—where the "defendant's contacts with the forum state . . . form the basis for the suit"—or "general"—where jurisdiction is based on "the defendant's general, more persistent, but unrelated contacts with the state." *CareFirst*, 334 F.3d at 397. Specific jurisdiction requires an analysis of "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Id.* (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 239 F.3d 707, 711–12 (4th Cir. 2002)). General jurisdiction

16

requires that "the defendant's activities in the state . . . have been 'continuous and systematic.'" *Id.* (internal citation omitted).

Alternatively, "it is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court[.]" *Nat'l Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 (1964); *see also Network Solutions, Inc. v. Hoblad, B.V.*, 82 F. App'x 845, 846 (4th Cir. 2003) ("the registration agreement contained a clause under which the registrant . . . consented to jurisdiction in the Eastern District of Virginia, and . . . such clauses are generally enforceable[.]").

Finally, Maryland courts recognize an agency-based "conspiracy theory of jurisdiction," under which,

> [W]hen (1) two or more individuals conspire to do something (2) that they could reasonably expect to lead to consequences in a particular forum, if (3) one co-conspirator commits overt acts in furtherance of the conspiracy, and (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state, then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum.

*Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 486 (Md. 2006) (quoting *Cawley v. Bloch*, 544 F. Supp. 133, 135 (D. Md. 1982)). Under this theory, "one co-conspirator is acting as the agent of the others," and the other co-conspirators are thus liable for any acts "done 'by an agent' within the meaning of § 6-103(b) of the Maryland long-arm statute." *Id.* However, because of the "fundamental due process requirement that a defendant can be involuntarily subject to the personal jurisdiction of the forum only if [he] 'purposefully avails [him]self of the privilege of conducting activities in the forum state,'" *id.* at 489 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)), jurisdiction may be imputed to a co-conspirator "only if [he] reasonably expects *at the time [he] agreed to participate in the conspiracy* that such acts will be done and that such acts will subject

the co-conspirator who performs them to the personal jurisdiction of the forum state." *Id.* (emphasis in original).

### 2. *Analysis*

First, the Court has personal jurisdiction over each Defendant who is party to at least one of the Loan contracts, all of which contain a binding forum selection clause. That clause—which appears identically in each Note and each Guaranty Agreement—reads in relevant part that the borrower and guarantors, by signing, agreed to "submit[ ] to the personal, nonexclusive jurisdiction and venue of state courts sitting in, and federal courts having jurisdiction over, Baltimore City, Maryland[.]" (*See, e.g.*, Contract Documents for Loan One at 24 ¶ 22, 41 ¶ 6.5.) Because the Defendant-signatories to the Loan contracts—namely, the Alexander Pavlovsky Defendants and Konstantin Pavlovsky—"agree[d] in advance" to this provision, this Court, having jurisdiction over Baltimore City, may bind them to judgment regardless of their relationships to the state of Maryland. *Szukhent*, 375 U.S. at 316.

As to those Defendants who did *not* expressly consent to the personal jurisdiction of this Court—the Cabrera Defendants—the analysis is not so simple. Those Defendants must be subject to either general or specific jurisdiction in Maryland, and the Court's exercise of that jurisdiction must comport with due process, if any judgment entered in this matter is to bind them. *CareFirst*, 334 F.3d at 396–97. The record reflects that Cabrera is a resident of New Jersey, and that each of his companies is incorporated and has its principal place of business in either New Jersey or Florida. (Compl. ¶¶ 4, 6, 8, 10, 12, 14, 16.) Dominion does not claim that this Court has general jurisdiction over the Cabrera Defendants. (*See generally* Compl.) It alleges instead that this Court has specific "personal jurisdiction over Defendants under the Maryland Long-Arm Statute, § 6-103," but it does not specify which provision or provisions of that statute apply here. (*See id.* ¶

22).  Dominion's allegations as to the Cabrera Defendants are limited to the scheme to inflate the prices of the Properties in Florida and New York and Cabrera's receipt of wire transfers from Rubakha Realty LLC, a New Jersey company with its principal place of business in New Jersey and a mailing address in Florida.  *(See generally id.* ¶¶ 29–114.)  Absent from these facts is any overt conduct within the state of Maryland.

Nevertheless, this Court may exercise personal jurisdiction over the Cabrera Defendants under the conspiracy theory of jurisdiction.  Dominion alleges that between March and October of 2021, Cabrera's companies sold the Properties to Alexander Pavlovsky's companies at markups of several hundred percent, and that Alexander Pavlovsky's companies sought loans from Dominion within days or weeks of each real estate transaction.  *(See id.* ¶¶ 24–102.)  Dominion describes this as a "circular fraudulent scheme in which Mr. Cabrera and the Pavlovskys would transfer money back and forth between them using Dominion's loaned money."  *(Id.* ¶ 27.)  It also asserts that "Defendants, either through the Pavlovskys *or Mr. Cabrera*, falsely represented to Dominion that the purchase prices of the [Properties] were valued in the millions[.]"  *(Id.* ¶ 319.)  Based on these allegations, and drawing inferences in favor of Dominion, Cabrera should reasonably have known "at the time [he] agreed to participate in the conspiracy" that Alexander Pavlovsky's companies would seek to use the Properties' inflated values to defraud a lending company, that they would sign mortgage agreements to obtain the loaned funds, and that they would be liable under those contracts for their fraudulent conduct.  *Mackey*, 892 A.2d at 489. Under these circumstances, where the Cabrera Defendants conspired with the Alexander Pavlovsky Defendants to induce a lending company to originate multiple outsize loans, the Court is satisfied that the Cabrera Defendants reasonably expected the Alexander Pavlovsky Defendants to take the actions that have led to the litigation now before the Court.  *Cf. Capital Source Fin.,*

*LLC v. Delco Oil, Inc.*, 625 F. Supp. 2d 304, 315–16 (D. Md. 2007) (finding no jurisdiction for out-of-state defendant whose co-conspirator "sign[ed a] Loan Agreement and [a] Guarantee Agreement with a Maryland lender and . . . suppl[ied] false documentation in support of that loan request," reasoning that because defendant's involvement was limited to later "failing to repay the loan, *rather than with the loan's origination*, any connection between [defendant] and [co-conspirator's] alleged activities directed toward Maryland . . . is too attenuated to be deemed foreseeable[.]") (emphasis added)).

The Court thus concludes that it may exercise personal jurisdiction over all of the Defendants.

### B. *Merger as to Loans Three and Seven*

As another initial matter, the Court must determine whether it may impose money judgments as to Loans Three and Seven despite the prior entry of final judgments of foreclosure on those Properties in Miami-Dade County, Florida. It concludes that it may.

#### 1. *Legal Standard*

The doctrine of merger provides that, "when a judicial investigation has resulted in the rendition of a judgment, the original claim is said to be merged in the judgment. In other words, the specific cause of action has ceased to exist, and cannot subsequently become the foundation for another suit." *Johnson v. Hines*, 61 Md. 122, 136 (1883); *see also Acme Boot Co. v. Tony Lama Interstate Retail Stores, Inc.*, 929 F.2d 691, at *5 (Table) (4th Cir. 1991) ("*Merger* occurs when a valid and final personal judgment for money is entered for plaintiff. His original *cause of action* is merged into the judgment and is extinguished. Plaintiff can maintain a subsequent action only on the judgment and not on the original cause of action."). Once a claim has merged into a judgment, res judicata generally "bars a party from relitigating" that claim. *Laurel Sand & Gravel,*

*Inc. v. Wilson*, 519 F.3d 156, 161 (4th Cir. 2008); *see also* Restatement (Second) of Judgments §

18 cmt. d (Am. L. Inst. 1982) ("Under the Full Faith and Credit Clause of the Constitution, a large

category of judgments must be given the same res judicata effects . . . as they are accorded in the

respective states of rendition.") "Generally, the preclusive effect of a judgment rendered in state

court is determined by the law of the state in which the judgment was rendered." *Laurel*, 519 F.3d

at 162. The question, therefore, is whether, under Florida law, the Florida court's judgments of

foreclosure fully reduced to judgment Dominion's claims under Loans Three and Seven such that

its claims for fraud, breach of contract, and breach of guarantor have "ceased to exist." *Hines*, 61

Md. at 136.

### 2. *Analysis*

The Court is satisfied that they did not, and that final judgment may yet be entered in this

matter as to the still-outstanding amounts due under Loans Three and Seven. Under Florida law,

if the sale of a foreclosed property does not discharge the entirety of the mortgagor's debt to the

mortgagee, the entry of a "deficiency decree"—a judgment for "the balance of the indebtedness

after applying the proceeds of a sale of the mortgaged property," *L.A.D. Prop. Ventures, Inc. v.

First Bank*, 19 So. 3d 1126, 1127 (Fla. Dist. Ct. App. 2009) (citation omitted)—"shall be within

the sound discretion of the court" presiding over the foreclosure action. Fla. Stat. § 702.06 (2013).

"The complainant *shall also have the right to sue at common law* to recover such deficiency, unless

the court in the foreclosure action has granted or denied a claim for a deficiency judgment." *Id.*

(emphasis added). Further, the Florida District Court of Appeal has held that a deficiency

judgment following foreclosure is distinct from "a judgment on [the underlying mortgage] note,"

and that "[e]ven though [a] mortgage ha[s] been foreclosed," a mortgagee "still ha[s] a right to

maintain an action at law on the note as long as a deficiency judgment ha[s] not been entered[.]"

21

*De Las Cuevas v. Nat'l Enters., Inc.*, 927 So. 2d 41, 44 (Fla. Dist. Ct. App. 2006). To summarize, if a mortgagor still owes its mortgagee following foreclosure and the presiding court made no final determination on whether to enter a deficiency judgment, Florida law expressly allows the mortgagee to seek a money judgment for the outstanding balance—either as a deficiency judgment *or* as a judgment on the note—in a separate action. As such, unless it includes a final determination on a deficiency judgment, a final judgment of foreclosure in Florida does not trigger the doctrine of merger with respect to the mortgagee's right to be made financially whole under the terms of the underlying mortgage.

Comparing the final judgment entered as to Loan Two—which Dominion concedes was both a judgment of foreclosure *and* a money judgment (*see* Mot. Default J. ¶ 63 n.3)—with those of Loans Three and Seven, it is evident that the Florida court made no final determinations on deficiency judgments and imposed no other financial liability with respect to Loans Three and Seven. All three judgments contain a provision reserving the presiding court's jurisdiction "to enter a deficiency judgment[,]" implying that the judgments of foreclosure themselves do not include a final determination on that issue. (Ex. 2 to Mot. Default J. ¶ 9; Ex. 3 to Mot. Default J. ¶ 8; Ex. 4 to Mot. Default J. ¶ 8.) The Loan Two judgment contains a paragraph providing the following:

> **Breach of Guarant[y] (Count III).** Final Judgment is hereby entered in favor of Plaintiff . . . and against Guarantors, Alexander Pavlovsky and Konstanti[n] Pavlovsky . . . Plaintiff shall recover from Guarantors the sum of $1,956,758.00 along with attorneys' fees in the amount of $10,080.00 and costs in the amount of $1,565.00 for a grand total of $1,968,403.00, that shall bear interest at the legal rate of 4.75% per annum for which let execution now issue.

(Ex. 2 to Mot. Default J. ¶ 8.) Neither the Loan Three judgment nor the Loan Seven judgment contains a comparable paragraph. (*See generally* Exs. 3, 4 to Mot. Default J.) In view of these facts, the Court concludes that Dominion's claims for money judgments on Loans Three and Seven

22

were not fully satisfied by the Florida court's final judgments of foreclosure, and that the doctrine of merger therefore does not bar the entry of final money judgments in this action. So satisfied, the Court will turn to the merits of Dominion's Motion for Default Judgment.

### C. Fraud

The Court will first address the question of whether Defendants are jointly and severally liable for the full amount of Dominion's compensatory damages because of their participation in the scheme to defraud Dominion. While the record supports the conclusion that the Alexander Pavlovsky Defendants and the Cabrera Defendants all participated willfully in the scheme to defraud Dominion, Dominion has failed to prove that Konstantin Pavlovsky did the same.

#### 1. Legal Standard

To recover damages for fraud in Maryland, a plaintiff must prove the following elements by clear and convincing evidence:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S & R, Inc.*, 639 A.2d 660, 664, 668 (Md. 1994). "Maryland courts," like federal courts, *see* Fed. R. Civ. P. 9(b), "have long required parties to plead fraud with particularity." *McCormick v. Medtronic, Inc.*, 101 A.3d 467, 492 (Md. Ct. Spec. App. 2014) (collecting cases). A plaintiff satisfies the particularity requirement by alleging "who made what false statement, when, and in what manner . . . ; why the statement is false; and why a finder of fact would . . . conclude that the defendant acted with scienter . . . and with the intention to persuade others to rely on the false statement." *Id.* at 492–93.

23

Where a corporation's agent signs a contract on behalf of the corporation with "the deliberate intention and purpose of cheating and defrauding one who is a party to the contract[,] . . . not only is the corporation liable for such action, but the agents who engage in the conspiracy are personally liable for damages resulting from such a transaction." *Ace Dev. Co. v. Harrison*, 196 Md. 357, 366–67 (1950).

"[W]here two or more persons conspire to carry out a fraud to cheat another, each of them is liable to the defrauded party irrespective of the degree of his activity in the fraudulent transaction or whether he shared in the profits of the scheme." *Etgen v. Washington Cty. Bldg. & Loan Ass'n*, 41 A.2d 290, 292 (Md. 1945). Joint liability for each co-defendant is established "[i]f it is shown that he knew of the fraudulent scheme and wilfully aided in its execution[.]" *Id.*; *see also Stratton v. Miller*, Civ. No. H-89-751, 113 B.R. 205, 211 (D. Md. 1989) ("Analysis of the *Etgen* case indicates that Maryland law requires that a defendant must willfully aid in execution of a fraudulent scheme to be held liable as a participant in a fraud.").

### 2. Analysis

#### a. Alexander Pavlovsky Defendants

First, Dominion has alleged with particularity that Alexander Pavlovsky, acting both in his personal capacity and as an agent for each Loan's Defendant-borrower, made multiple fraudulent misrepresentations to Dominion with the intent to cause compensable injuries amounting to the full outstanding value of the Loans. Acting on behalf of his companies—which, importantly, created liability for both his companies and himself, *see Ace*, 196 Md. at 366–67—he represented to Dominion that each of the Properties was worth significantly more than what he knew to be its fair market value. (*See generally* Compl. ¶¶ 29–102.) By the terms of the Loan contracts, Dominion had the right to rely on those representations, and had Alexander Pavlovsky not made

them, Dominion would not have extended such outsize loans for the purchase and renovation of the Properties. (*See* Contract Documents for Loan One at 7 ¶ 8 ("Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender[.]").) Further, Alexander Pavlovsky personally presented Dominion with falsified construction permits for several of the Properties so that Dominion would disburse hundreds of thousands of dollars in construction funds. (Compl. ¶¶ 115–122.) Dominion evidently relied on those permits, considering that it had the contractual right to refuse to disburse the construction funds if Alexander Pavlovsky did not produce them. (*See* Contract Documents for Loan One at 28 ¶ 2.3(c)(i) ("Lender may withhold disbursements for any work for which the Jurisdiction requires a permit without documentation of the permit.").) The Court is convinced, given both the preceding scheme to inflate the Properties' prices and ample evidence that the construction draws were not used to fund construction at the Properties, that Alexander Pavlovsky made these misrepresentations with the intent to defraud Dominion out of the excess Loan amounts. Accordingly, the Court concludes that, as to Alexander Pavlovsky and each of the Defendant-borrowers for which he acted as an agent—namely, Miami42 LLC, 5421 NW5 LLC, 6811 Project LLC, HT Project LLC, 78 NE 57th LLC, 5437 NW5 LLC, and Rubakha Realty Inc.—Dominion has pled fraud with the requisite degree of particularity.

The Court also concludes that Dominion has sufficiently alleged that the remaining Alexander Pavlovsky Defendants—Rubakha Realty LLC and MPAV Realty LLC—made material misrepresentations with the intent to defraud Dominion. Alexander Pavlovsky, acting in his capacity as the "Sole Member" of each company, signed the Guaranty Agreements for Loans Five and Seven on their behalf. (*See* Contract Documents for Loans Five and Seven.) Alexander

25

Pavlovsky also signed the Guaranty Agreement for Loan Six on behalf of Rubakha Realty LLC. (*See* Contract Documents for Loan Six.) Because the Court has found that Alexander Pavlovsky executed the Loan contracts with the intent to defraud Dominion, it infers that Alexander Pavlovsky purposely caused both companies to misrepresent to Dominion that it was likely to be made whole on the Loans. Dominion had the right to rely on these guarantors' misrepresentations. (*See* Contract Documents for Loan One at 34 ("To induce Lender to extend the Loan, the Guarantor desires to guaranty the Borrower's payment of the Loan and the performance of Borrower's obligations as set forth in the Loan Documents.").)   Accordingly, the Court is satisfied that Dominion has pled fraud with sufficient particularity as to the Alexander Pavlovsky Defendants.

### b. Cabrera Defendants

Dominion has also alleged with sufficient particularity that each of the Cabrera Defendants knowingly and willfully acted in furtherance of Alexander Pavlovsky's scheme to defraud Dominion. *Etgen*, 41 A.2d at 292. Cabrera, either personally or acting as an agent of each of his companies, purchased each of the Properties and then sold them almost immediately thereafter to Alexander Pavlovsky's companies at markups of several hundred percent.  (Compl. ¶¶ 24–102.) As discussed above, these eight real estate transactions occurred over the course of several months, and Alexander Pavlovsky's companies sought each Loan within days or weeks of each transaction. (*Id.*)   Further, Cabrera received eight kickbacks via wire transfer from Rubakha Realty LLC between February and April of 2021. (*Id.* ¶¶ 103–114.) These facts tend to establish not only that Cabrera knew the Properties' true values and willfully conspired with Alexander Pavlovsky to inflate their prices, but also that he knew when he agreed to join the conspiracy that Alexander Pavlovsky intended to use the Properties' inflated prices to defraud a lending company and keep the excess Loan funds. Because Cabrera acted knowingly as an agent of each of his Defendant

companies—namely, Kendall Miami Land LLC, Miami5th Developers LLC, NW 4th Land LLC, 540 NW 69th St LLC, 57th Land LLC, and GST Development Inc.—to further this scheme by selling the Properties to Alexander Pavlovsky, both he and they are liable to Dominion for the scheme to defraud. *Ace*, 196 Md. at 366–67.

### c. *Konstantin Pavlovsky*

The record does not, however, support a finding that Konstantin Pavlovsky either personally defrauded Dominion or participated knowingly and willfully in Alexander Pavlovsky's scheme to defraud. First, Dominion has not sufficiently alleged that Konstantin Pavlovsky had a role in the preceding real estate transactions. (*See generally* Compl. ¶¶ 24–122.) Despite Dominion's bare assertion that Cabrera sold the Properties "to A. Pavlovsky and K. Pavlovsky," (*id.* ¶ 24), the Complaint specifies that each Property's buyer was "A. Pavlovsky's company" alone. (*Id.* ¶¶ 29, 37, 47, 57, 66, 76, 86, 95.) Because there are no particularized allegations that Konstantin Pavlovsky knew of the price-hiking scheme, the pleadings also fail to establish that he knew at the time that he guaranteed the Loan contracts that his son had made misrepresentations to Dominion about the Properties' value and intended to further the scheme to defraud. (*See generally id.*)

Similarly, Dominion's assertion that *both* Pavlovskys "routinely made wire transfers to Mr. Cabrera as kickbacks for helping their fraudulent scheme" lacks particularity. (*Id.* ¶ 103.) Dominion has established that a bank account registered to Rubakha Realty LLC, a company for whom Konstantin Pavlovsky is the registered agent, initiated $92,000 in wire transfers to Cabrera between February and May of 2021. (*Id.* ¶¶ 103–114.) As Dominion pointed out, however, "on the bank statements . . . [Alexander] Pavlovsky's address is listed for Rubakha Realty LLC[.]" (*Id.* ¶ 103.) The Court notes as well that Alexander Pavlovsky signed the Guaranty Agreements for

Loans Five, Six, and Seven as the "Sole Member" of Rubakha Realty LLC. (*See* Contract Documents for Loans Five, Six, Seven.) These facts, taken together, do not support Dominion's assertion that Konstantin Pavlovsky personally authorized or directed the payment of kickbacks to Cabrera. Given that Alexander Pavlovsky evidently had access to the bank account and was the designated recipient for account-related mail, it would be reasonable to infer instead that he wired the kickbacks to Cabrera without Konstantin Pavlovsky's knowledge. In sum, without more, Dominion has not established with the requisite particularity that Konstantin Pavlovsky either personally defrauded Dominion or knew of his son's fraud and willfully aided in its execution.

### d. Conclusion

For the reasons set forth above, the Court will grant in part and deny in part Dominion's Motion for Default Judgment insofar as it seeks a judgment against all Defendants for fraud. The Court will enter judgment in favor of Dominion and against the Alexander Pavlovsky Defendants and the Cabrera Defendants, jointly and severally, for $9,079,051.78, the full outstanding balance of the Loans, plus accruing post-judgment interest in accordance with 28 U.S.C. § 1961.[10] The Motion will be denied in part insofar as it seeks the imposition of liability for fraud against Konstantin Pavlovsky.

### D. Breach of Contract and Breach of Guarantor

As to Dominion's claims for breach of contract and breach of guarantor, the Court concludes that Dominion is contractually entitled to judgment for the outstanding balance of each Loan against its signatories. Accordingly, it will impose judgment on Konstantin Pavlovsky—the only remaining Defendant who has not already been found liable for the full outstanding balance

---

[10] "Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding." *Id.*

of the Loans—in the amount of $4,383,875.39, the sum of the outstanding balances of Loans One, Three, Four, and Eight, all of which he guaranteed, plus post-judgment interest pursuant to 28 U.S.C. § 1961.

### *1. Legal Standard*

"To prevail in an action for breach of contract" in Maryland, "a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). A plaintiff in a breach of contract action may recover "the damages . . . aris[ing] naturally from the breach of contract itself or . . . reasonably within the contemplation of the parties at the time the contract was entered." *Stone v. Chicago Title Ins. Co. of Md.*, 624 A.2d 496, 502 (Md. 1993).

It is a "fully recognized" and "uniformly applied" rule in Maryland that "a stipulation in a mortgage providing that the whole debt secured thereby shall become due and payable upon failure of the mortgagor . . . to comply with any [ ] condition of the mortgage, is a legal, valid, and enforceable stipulation, and [not] a penalty or forfeiture." *Lotterer v. Leon*, 113 A. 887, 889 (Md. 1921) (quoting 19 Ruling Case L. § 289 (quotations omitted)). Where a contract contains an optional acceleration clause, "a breach of [a] condition in [the] mortgage will not accelerate the date of its payment, unless the mortgagee so elects." *Kleiman v. Kolker*, 57 A.2d 297, 300 (Md. 1948).

With respect to guarantor liability, when a borrower defaults on a guaranteed contract, "[t]he liability of a guarantor of payment is indistinguishable from that of a co-maker." *Rosenbloom v. Feiler*, 431 A.2d 102, 106 (Md. 1981) (citing *Etelson v. Suburban Trust Co.*, 283 A.2d 408, 411 (Md. 1971)). In other words, "'[t]he unconditional guarantor is in a very real sense the debtor,'" insofar as he becomes "absolutely liable" for the performance of the borrower's

29

contractual obligations. *Gambo v. Bank of Md.*, 648 A.2d 1105, 1108–09 (Md. Ct. Spec. App. 1994) (quoting *Ford Motor Credit Co. v. Lototsky*, 549 F. Supp. 996, 1004 (E.D. Penn. 1982), citing *Rosenbloom*, 648 A.2d at 106).

### 2. Analysis

Dominion has sufficiently alleged its claims for breach of contract and breach of guarantor. The Alexander Pavlovsky Defendants committed multiple "Events of Default" under each Loan contract, including by making fraudulent misrepresentations about the Properties' values, failing to complete construction on the Properties, doing that construction without proper permits, and withdrawing construction funds that were not used to fund construction. (*See generally* Compl., Contract Documents for Loan One.) Each Loan's guarantors agreed to be held jointly, severally, and unconditionally liable for each borrower's liability under the Loan contracts. (*See, e.g.*, Contract Documents for Loan One at 43 ¶ 6.13, 36 ¶ 3.1(a).)

As discussed above, a court may impose default judgment without a hearing if there is "a sufficient basis in the pleadings for the judgment entered." *Nishimatsu*, 515 F.2d at 1206; *see also* Fed. R. Civ. P. 55(b)(2). The court may rely on "detailed affidavits or documentary evidence to determine the appropriate sum" of damages. *IAAAA*, 2021 WL 2685362, at *2. The record here contains copies of each Loan contract. (*See* Exs. B, E, H, M, Q, U, X, BB to Compl.) Additionally, Dominion has provided the affidavit of Jack Bevier, a Dominion Partner who attests that, at the time that Dominion moved for default judgment, it was owed $650,000 for Loan One, $1,426,875.39 for Loan Three, $540,000 for Loan Four, $1,480,000 for Loan Five, $1,720,000 for Loan Six, $1,495,176.39 for Loan Seven, and $1,767,000 for Loan Eight. (Ex. 1 to Mot. Default J.)

Based on these figures and the underlying Loan contracts, the Court concludes that the following chart represents an accurate accounting of Defendants' liability to Dominion for breach of contract and breach of guarantor as to each Loan:

| (1) SW 42nd Ave | (2) 5421 NW 5th Ave | (3) 6775 NW 4th Ave | (4) NW 69th St. |
|---|---|---|---|
| **Borrower:**<br>Miami42 LLC<br><br>**Guarantors:**<br>Alexander Pavlovsky,<br>Konstantin Pavlovsky<br><br>**Outstanding as of Dec. 28, 2022:**<br>$650,000 | **Borrower:**<br>5421 NW5 LLC<br><br>**Guarantors:**<br>Alexander Pavlovsky,<br>Konstantin Pavlovsky<br><br>**Outstanding as of Dec. 28, 2022:**<br>$0 | **Borrower:**<br>6811 Project LLC<br><br>**Guarantors:**<br>Alexander Pavlovsky,<br>Konstantin Pavlovsky<br><br>**Outstanding as of Dec. 28, 2022:**<br>$1,426,875.39 | **Borrower:**<br>HT Project LLC<br><br>**Guarantors:**<br>Alexander Pavlovsky,<br>Konstantin Pavlovsky<br><br>**Outstanding as of Dec. 28, 2022:**<br>$540,000 |
| **(5) NE 57th St.** | **(6) 5437 NW 5th Ave** | **(7) 6811 NW 4th Ave** | **(8) Cannon Ave (NY)** |
| **Borrower:**<br>78 NE 57th LLC<br><br>**Guarantors:**<br>Alexander Pavlovsky,<br>Rubakha Realty LLC,<br>MPAV Realty LLC<br><br>**Outstanding as of Dec. 28, 2022:**<br>$1,480,000 | **Borrower:**<br>5437 NW5 LLC<br><br>**Guarantors:**<br>Alexander Pavlovsky,<br>Rubakha Realty LLC<br><br>**Outstanding as of Dec. 28, 2022:**<br>$1,720,000 | **Borrower:**<br>6811 Project LLC<br><br>**Guarantors:**<br>Alexander Pavlovsky,<br>Rubakha Realty LLC,<br>MPAV Realty LLC<br><br>**Outstanding as of Dec. 28, 2022:**<br>$1,495,176.39 | **Borrower:**<br>Rubakha Realty Inc.<br><br>**Guarantors:**<br>Alexander Pavlovsky,<br>Konstantin Pavlovsky<br><br>**Outstanding as of Dec. 28, 2022:**<br>$1,767,000 |

Accordingly, the Court will grant Dominion's Motion for Default Judgment as it relates to Dominion's claims for breach of contract and breach of guarantor. However, because all Defendant-signatories other than Konstantin Pavlovsky have already been found liable for the full outstanding balance of the Loans due to their role in the scheme to defraud Dominion, additional judgment will be entered against only Konstantin Pavlovsky, jointly and severally with the Alexander Pavlovsky Defendants and the Cabrera Defendants, for the outstanding balances of Loans One, Three, Four, and Eight—totaling $4,383,875.39. *See* Fed. R. Civ. P. 54(c).

### E. Prejudgment Interest

Next, the Court must determine whether Dominion is entitled to prejudgment interest on the outstanding Loan balances. In Maryland, "[p]rejudgment interest *must* be granted where 'the obligation to pay and the amount due' were 'certain, definite, and liquidated by a specific date prior to judgment.'" *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 311 (4th Cir. 2020) (emphasis in original) (quoting *Buxton v. Buxton*, 770 A.2d 152, 165 (Md. 2001)). However, "the default for contract cases" is that "[p]rejudgment interest *may* be granted, but is not required," and the determination of whether to award it "is within the discretion of the trier of fact." *Id.* (emphasis in original) (quoting *Buxton*, 770 A.2d at 165 (quotations omitted)). As the *Parkway* court explained,

> Courts must determine whether [prejudgment interest is required] based on their level of certainty as to the existence, amount, and due date of an obligation to pay. . . . [W]here such certainty exists, the effect of the debtor's withholding payment [is] to deprive the creditor of the use of a fixed amount as of a known date, and mandatory prejudgment interest is meant to rectify the situation. Where the impact of withholding payment is less certain, the trier of fact has discretion to award prejudgment interest as appropriate to the unique circumstances of the case."

*Id.* at 312 (internal quotations and citations omitted).

Dominion, relying on *Parkway*, contends that it is entitled to prejudgment interest at Maryland's maximum rate of six percent per annum dating back to the date of execution of each Loan.[11]  (*See, e.g.*, Mot. Default J. ¶ 64 ("[T]he loan documents were executed on November 18, 2021. . . . Dominion's claim for the remaining principal on the loan . . . became fixed and certain on November 18, 2021.")); *see* Md. Const. Art. III, § 57 ("The Legal Rate of Interest shall be Six

---

[11] The Court notes that Dominion's request for prejudgment interest as to Loan Eight differs from this pattern. (*See* Mot. Default J. ¶ 70 ("the loan documents were executed on March 30, 2021. . . . Dominion's claim for the remaining principal on the loan . . . became fixed and certain on November 18, 2021.").) Because the date November 18, 2021 appears in a similar paragraph elsewhere in the Motion (*see id.* ¶ 64), the Court presumes that this was a drafting oversight.

per cent. per annum; unless otherwise provided by the General Assembly."). Dominion does not make its logic explicit, but the Court presumes that because the Alexander Pavlovsky Defendants made fraudulent misrepresentations to induce Dominion to enter each Loan contract—conduct which in and of itself constituted a default (*see, e.g.*, Contract Documents for Loan One at 7 ¶ 8)— Dominion views the dates of execution as the dates of default, and therefore the "specific dates" on which it became entitled to the "certain, definite, and liquidated" balance of each Loan. *Parkway*, 961 F.3d at 311.

This reasoning fails. The Alexander Pavlovsky Defendants' misrepresentations about the value of the Properties did constitute defaults, and those defaults did trigger Dominion's right under each Loan contract to accelerate repayment—but this right was discretionary, meaning that default did not *automatically* trigger acceleration on a specific date. The relevant clause in each contract provides that, "[u]pon the occurrence of any Event of Default[,]" Dominion would have "sole discretion" to "*[d]eclare* the entire outstanding principal amount, together with all accrued interest and all other sums due under this Note, to be immediately due and payable . . . without diligence, presentment, demand or notice, which are hereby expressly waived[.]" (Contract Documents for Loan One at 22 ¶ 11 (emphasis added).) Crucially, Dominion does not contend that it *declared* the entire outstanding principal due on the date of each Loan's execution—and the Defendant-parties' obligations to pay therefore did not become fixed and certain on those dates. *See Kleiman*, 57 A.2d at 300. Further, it defies logic to conclude that Dominion would have exercised its right to accelerate each Loan contract on the date it was made when the record reflects that it entered into eight separate Loan contracts with companies owned by Alexander Pavlovsky between March and November of 2021.

The most straightforward interpretation of the facts of this case is that, at some point after the Loan contracts were executed, Dominion discovered Defendants' fraudulent scheme and decided to accelerate repayment on the Loans via this litigation. Dominion has not alleged that it discovered Defendants' fraud on a particular date, nor does it specify on which date, if any, it formally declared the Loans due in full. (*See generally* Compl.) Further, even assuming that Dominion is entitled to prejudgment interest dating back to specific dates in 2021, the Court cannot ascertain how much Defendants would have owed Dominion on those dates because the only sworn accounting of the outstanding Loan balances on which the Court may rely in imposing default judgment is dated December 28, 2022 and incorporates judgments of foreclosure obtained in October of 2022. (*See* Exs. 1–4 to Mot. Default J.); *see Ryan*, 253 F.3d at 780. On this record, the Court does not find that Defendants' obligation to repay the Loans in full was "certain, definite, and liquidated by [the] *specific date*" on which each Loan contract was executed such that Dominion must be granted mandatory prejudgment interest from those dates. *Parkway*, 961 F.3d at 311 (internal quotations omitted) (emphasis added).

Nevertheless, the circumstances of this case *do* support a discretionary award of prejudgment interest of six percent per annum dating back to December 28, 2022. This is the earliest date on which the record adequately supports Dominion's entitlement to recover a definite outstanding balance on the Loans. *See Nishimatsu*, 515 F.2d at 1206 ("There must be a sufficient basis in the pleadings for the judgment entered.").

Accordingly, the Court will grant in part Dominion's Motion for Default Judgment insofar as it requests an award of prejudgment interest. Judgment will be entered for prejudgment interest of six percent per annum, calculated from December 28, 2022, against the Alexander Pavlovsky

Defendants and the Cabrera Defendants on the full balance of the Loans and against Konstantin Pavlovsky on the balance of Loans One, Three, Four, and Eight.

### F. Attorney's Fees

The Court turns finally to Dominion's request for attorneys' fees totaling $65,332 and costs totaling $22,947.87. (Mot. Default J. ¶¶ 72–78.) Because the Loan contracts at issue each contain valid fee-shifting provisions, and because under the specific circumstances of this case the Court finds Dominion's fees and costs reasonable, Dominion's request will be granted and those Defendants who are party to the Loan contracts—namely, the Alexander Pavlovsky Defendants and Konstantin Pavlovsky—will be jointly and severally liable for the full amount of $88,279.87.

### 1. Legal Standard

"A contractual obligation to pay attorneys' fees generally is valid and enforceable in Maryland." *Atlantic Contracting & Material Co., Inc. v. Ulico Cas. Co.*, 844 A.2d 460, 477 (Md. 2004). "Even in the absence of a contract term limiting recovery to reasonable fees, trial courts are required to read such a term into the contract and examine the prevailing party's fee request for reasonableness." *Myers v. Kayhoe*, 892 A.2d 520, 532 (Md. 2006). "The trial court's determination of the reasonableness of attorney's fees is a factual determination within the sound discretion of the court"—but where a contract provides for the *mandatory* award of fees, the court "[does] not have discretion to refuse to award fees altogether." *Id.* "The burden is on the party seeking recovery to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees." *Ulico*, 844 A.2d at 478 (quoting *Maxima Corp. v. 6933 Arlington Dev. Ltd. P'Ship*, 641 A.2d 977, 983 (Md. Ct. Spec. App. 1994)).

Although this Court's starting point for deciding an award of reasonable attorneys' fees is generally to "first determine a lodestar figure by multiplying the number of reasonable hours

expended times a reasonable rate," *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th

Cir. 2009), the Maryland Supreme Court has held that "the lodestar method is an inappropriate

mechanism for calculating fee awards in private, contractual debt-collecting cases." *Monmouth*

*Meadows Homeowners Ass'n, Inc. v. Hamilton*, 7 A.3d 1, 7 (Md. 2010). Instead, courts "should

use the factors set forth in Rule 1.5" of the Maryland Lawyers' Rules of Professional Conduct "as

the foundation for analysis of what constitutes a reasonable fee" in these cases. *Id.* at 8. Those

factors are

> (1) the time and labor required, the novelty and difficulty of the questions involved,
> and the skill requisite to perform the legal service properly; (2) the likelihood, if
> apparent to the client, that the acceptance of the particular employment will
> preclude other employment of the attorney; (3) the fee customarily charged in the
> locality for similar legal services; (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances; (6) the nature
> and length of the professional relationship with the client; (7) the experience,
> reputation, and ability of the attorney or attorneys performing the services; and
> (8) whether the fee is fixed or contingent.

Md. R. Att'y 19-301.5(a).

### 2. *Analysis*

Dominion is entitled to recover its reasonable attorneys' fees and costs from those

Defendants who were parties to the Loan contracts, each of which contains valid fee-shifting

provisions binding both borrower and guarantors to pay Dominion's "cost[s]" and "Professional

Fees." (*See, e.g.*, Contract Documents for Loan One at 22 ¶ 12, 36 ¶ 3.2.) The Court finds

Dominion's request for $65,332 in attorneys' fees and $22,947.87 in costs reasonable in view of

the specific circumstances of this case.

### a. *Allegation of "Block Billing"*

Before proceeding to determine a reasonable award, the Court must confront Defendant

Alexander Pavlovsky's contention that Dominion's counsel engaged in impermissible "block

billing" that should "bar . . . in [its] entirety" the award of attorney's fees here. (Resp. Opp'n Mot. Default J. at ¶ 5.) "Block billing" is a method of fee-accounting "in which billable tasks that could be considered in some sense separate are combined for billing purposes[.]" *Weichert Co. of Md., Inc. v. Faust*, 989 A.2d 1227, 1237 (Md. Ct. Spec. App. 2010). While block billing may obscure certain details of attorney work from the reviewing court, "Maryland courts have not outright denied a fee award simply because block billing existed"—and indeed, "'[b]ecause such a precise delineation may not always be practicable . . . [Maryland courts] do not regard it as a *sine qua non* of the right to recover[.]'" *Bainbridge St. Elmo Bethesda Apartments, LLC v. White Flint Express Realty Grp. Ltd. P'ship*, No. 0376, 2016 WL 1321205, at *12 (Md. Ct. Spec. App. Apr. 5, 2016) (quoting *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 929 A.2d 932, 957 (Md. 2007)).

Alexander Pavlovsky's argument that any evidence of block billing should foreclose Dominion's recovery of attorneys' fees thus finds no basis in the law. Further, having reviewed the timesheets in their entirety, the Court finds them to be sufficiently detailed and thorough despite the existence of block billing. (Ex. 7 to Mot. Default J., ECF No. 62-7.) Accordingly, the Court rejects Alexander Pavlovsky's objection and will proceed, as it must, *see Myers*, 892 A.2d at 532, to determining a reasonable award of fees and costs.

### b. *Amount of Reasonable Attorneys' Fees and Costs*

For purposes of fee calculation, the Court will reference the affidavit and itemized timesheets submitted in support of the instant Motion by Dominion's counsel, Gordon Feinblatt LLC. (Exs. 6, 7 to Mot. Default J., ECF Nos. 62-6, 62-7.) Gordon Feinblatt attorney Robert Gaumont attests that he spent 62.7 hours working on the case at an hourly rate of $500—"lower than [his] standard hourly rate" and "based on the value of the case and the level of complexity"—

and that attorney Sudipta Das spent 104.1 hours working on the case at an hourly rate of first $315 and later $355. (Aff. Robert A. Gaumont, Ex. 6 to Mot. Default J.) In determining the reasonableness of the hourly rates charged by each attorney, the Court is guided by the advisory range set forth in Appendix B to the Local Rules, although it takes notice of subsequent increases in prevailing rates. It is not clear from the record how long Gaumont and Das have been admitted to the bar, but Gaumont affirms that he was lead counsel in this matter and that Das, an associate, was co-counsel. (*Id.* ¶ 9.) While Gaumont's hourly rate in this case falls outside the Appendix B advisory range for experienced attorneys, the Court acknowledges that Dominion received a discounted rate that exceeds the range by only $25 per hour, and that most of the work was completed by Das, whose hourly rates fall just above the advisory ranges for attorneys with between five and fourteen years' experience. (*See id.*) The Court is therefore satisfied that the rates charged by Dominion's counsel are reasonable.

Considering the Rule 1.5 factors, the Court concludes that a total of 166.8 hours of work on the instant litigation—which has consisted of an inordinately difficult undertaking of service of process and a contested default judgment—is reasonable. Courts in this District have found that approximately half that number of hours was appropriate in cases involving *uncontested* default judgments. *See, e.g., Wei v. Xu*, Civ. No. ELH-21-601, 2022 WL 1422926, at *14–*15 (D. Md. May 4, 2022) (awarding $18,520 in fees for 72 hours of legal work following uncontested default judgment). Here, the record evinces that Dominion's counsel spent more than five months attempting to serve both Alexander and Konstantin Pavlovsky—during which time counsel were forced to seek the issuance of new summonses and the Court's permission to serve Konstantin Pavlovsky through alternative means. (*See* ECF Nos. 30, 42.) Additionally, Dominion's counsel litigated Alexander Pavlovsky's Motion to Set Aside Default (ECF No. 46). Given the difficulty

of tracking down the Pavlovskys and the time and labor expended to do so, as well as Dominion's ultimate success on the merits of both Alexander Pavlovsky's Motion to Set Aside Default and the instant Motion for Default Judgment, the Court finds Dominion's fee request for $65,3232 reasonable and appropriate under the circumstances.

For the same reasons, the Court finds Dominion's request for $22,947.87 in litigation costs to be reasonable. Gaumont attests that those costs were incurred in "hiring private investigators and process servers in order to repeatedly attempt service on [Alexander and Konstantin Pavlovsky,] who were evading service for several months." (Aff. Robert A. Gaumont ¶ 12.) The itemized timesheets submitted by Dominion's counsel show that at least $4,000 was spent on hiring process servers and that more than $18,000 was expended for "Private Investigatory Services" in this matter. (Ex. 7 to Mot. Default J.) This Court is intimately familiar with the pattern of evasion that the Pavlovskys have displayed throughout this litigation, (*see* Mem., ECF No. 55), and it therefore concludes that these expenses were reasonably required in order to effect service.

Accordingly, the Court will grant Dominion's Motion for Default Judgment to the extent that it seeks an award of $88,279.87 in attorneys' fees and costs, and it will impose liability for that sum jointly and severally on all Defendants who are parties to the Loan contracts.

## V.   *Conclusion*

For the foregoing reasons, a separate Order will issue (ECF No. 66) granting in part and denying in part Dominion's Motion for Default Judgment (ECF No. 62) as set forth above, dismissing the Cabrera Defendants, and closing this case.

DATED this ___18___ day of May, 2023.

BY THE COURT:

James K. Bredar
Chief Judge